Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| FREDDY A. MADERA SORIANO<br><br>PETICIONARIO<br><br>V.<br><br>SANDRA N. ABREU MATUSEVICIUS<br><br>RECURRIDA | TA2026CE00426 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Núm. MZ2019CV01333<br><br>Sobre: Liquidación de Comunidad de Bienes |
| --- | --- | --- |

Panel integrado por su presidenta, la Juez Lebrón Nieves, el Juez, Pagán Ocasio y la Jueza Álvarez Esnard.

Pagán Ocasio, juez ponente

# SENTENCIA

En San Juan, Puerto Rico, a 15 de mayo de 2026.

## I.

El 8 de abril de 2026, el señor Freddy A. Madera Soriano (peticionario o el señor Madera Soriano), presentó un recurso de *Certiorari* en el que nos solicitó que revoquemos un dictamen emitido por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (TPI o foro primario), el 10 de marzo de 2026 y notificado el mismo día.[1] Mediante este, el TPI emitió una *Resolución* en la que declaró No Ha Lugar a una *Moción de Reconsideración* presentada por el señor Madera Soriano. En su moción, el peticionario había solicitado al foro primario que modificara la determinación emitida el 29 de octubre de 2025, en donde había adjudicado una controversia sobre créditos en disputa, otorgándole alguno de ellos a la señora Sandra N. Abreu Matusevicius (parte recurrida).

---

[1] *Véase* entrada núm. 435 del expediente digital del caso en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC-TPI).

Junto al recurso, la parte peticionaria presentó una *Moción en Auxilio de Jurisdicción* en la que nos solicitó que ordenáramos la paralización inmediata de los procedimientos del caso de epígrafe ante el TPI.[2]

El 13 de abril de 2026, emitimos una *Resolución* en la que declaramos No Ha Lugar la solicitud de orden en auxilio de jurisdicción. Además, le concedimos a la parte recurrida hasta el 23 de abril de 2026, para exponer su posición sobre los méritos del recurso.[3]

El 20 de abril de 2026, la parte recurrida presentó un *Alegato*, mediante el cual solicitó que denegáramos la expedición del recurso peticionado.[4]

Con el beneficio de la comparecencia de las partes, damos por perfeccionado el recurso. En adelante, pormenorizamos los hechos procesales pertinentes para su atención.

**II.**

El caso de marras tuvo su génesis el 9 de agosto de 2019, cuando el peticionario radicó una *Demanda* sobre liquidación de bienes gananciales.[5] En dicha demanda, el peticionario detalló que las partes habían sostenido un matrimonio, procreado hijos y adquirido bienes. Además, el peticionario señaló que el 14 de marzo de 2019, otra sala del TPI había emitido una sentencia de divorcio. Acto seguido, el 12 de agosto de 2019, el TPI expidió los correspondientes emplazamientos.[6] La parte recurrida presentó el 20 de agosto de 2019 su *Contestación a Demanda*.[7]

Previo a la presentación de la demanda, y pertinente a las controversias ante nos, las partes habían suscrito un acuerdo sobre

---

[2] *Véase* entrada núm. 2 del expediente digital del caso en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC-TA).
[3] Íd., entrada núm. 3.
[4] Íd., entrada núm. 4.
[5] *Véase* entrada núm. 1 en SUMAC-TPI.
[6] Íd., entrada núm. 3.
[7] Íd., entrada núm. 5.

pensión alimentaria.[8] Allí, entre otras cosas, acordaron que el peticionario pagaría, en concepto de pensión alimenticia, tres mil dólares ($3,000) mensuales, adicional al cien por ciento de la hipoteca de la residencia en que vivían los menores. Posteriormente, y durante el trámite del pleito, el Tribunal de Primera Instancia estableció la custodia compartida de estos.[9] Aun luego de recibir la custodia compartida, el peticionario continuó pagando la totalidad de la hipoteca.

Tras varios incidentes procesales, innecesarios pormenorizar, el peticionario presentó ante el TPI una *Moción en Solicitud de Orden* el 11 de julio de 2022.[10] Mediante dicho escrito, el peticionario solicitó al foro primario que le ordenase a la recurrida a pagar la mitad de las mensualidades de la hipoteca, de modo que cesaren de acumularse los créditos a su favor, lo que, a su vez, facilitaría la pronta liquidación de los bienes.

Superados varios trámites procesales, la recurrida se opuso el 27 de octubre de 2022 mediante una *Moción en Cumplimiento de Orden y en Oposición a que se imponga a la demandada el pago de la mitad de la hipoteca de inmueble ganancial.*[11] En suma, adujo que dicha imposición resultaría excesivamente onerosa para ella. El 23 de noviembre de 2022, el foro primario dictó *Orden* y resolvió:

> Se declara No ha Lugar la solicitud de la parte demandante para que se imponga el pago a la demandada del 50% de la hipoteca sobre el bien ganancial. Cualquier pago realizado por el demandante sobre la referida hipoteca podrá ser reclamado como crédito al momento de la liquidación final de la Sociedad Legal de Gananciales.[12]

No conteste con esta solución, el peticionario presentó oportunamente una moción de reconsideración el 29 de noviembre

---

[8] Íd., anejo 1, entrada núm. 413.
[9] Íd., entrada núm. 408. No hay una entrada o una copia en el expediente de esta orden. No obstante, las partes no disputan este hecho.
[10] Íd., entrada núm. 133.
[11] Íd., entrada núm. 176.
[12] Íd., entrada núm. 186.

de 2022.[13] El 13 de enero de 2023, la recurrida radicó su correspondiente oposición.[14] El foro primario, luego de evaluar las peticiones de ambas partes, emitió la siguiente *Resolución*, el 3 de febrero de 2023:

> Examinada la Moción de Reconsideración presentada y su correspondiente Oposición, se declara No Ha Lugar la solicitud de Reconsideración **y se mantiene vigente la Resolución del 23 de noviembre de 2022 en relación al pago de la hipoteca. Se autoriza que la propiedad se alquile para el beneficio del pago de la hipoteca**. ...[15]

Dicha orden, en efecto, reafirmaba la determinación inicial del TPI de denegar la petición de ordenar el pago de la hipoteca por parte de la recurrida. De la misma manera, la aludida resolución afirmó que se eximía a la recurrida de estos pagos en virtud de que, al momento de liquidar la comunidad de bienes, el peticionario tendría un crédito mediante el cual podría reponer cualquier pago realizado en exceso. Adicionalmente, del texto citado se desprende que las partes estaban autorizadas a alquilar la propiedad.

Luego de varios trámites adicionales, el 3 de agosto de 2025, ambas partes suscribieron un escrito en conjunto, en donde estipularon el inventario de los bienes de la comunidad a dividir e informaron sobre los créditos en controversia.[16] Mediante dicha moción, las partes establecieron que habían tres periodos sobre los cuales se disputan los créditos: (1) de marzo de 2019 a octubre de 2021; (2) noviembre de 2021 a febrero de 2023 y (3) febrero de 2023 al presente. Por su parte, el peticionario solicitó créditos por el pago de la hipoteca desde el marzo de 2020, fecha en donde alegó que la recurrida había dejado de vivir en la residencia. Además, adujo que le correspondía un crédito por los pagos emitidos posterior al mes

---

[13] Íd., entrada núm. 187.
[14] Íd., entada núm. 204.
[15] Íd., entrada núm. 209 (énfasis suplido).
[16] Íd., entrada núm. 408.

de octubre de 2021, donde se le asignó la custodia compartida de los menores.

*A contrario sensu*, la recurrida alegó que le correspondían unos créditos por los pagos a la hipoteca que realizó el peticionario entre marzo de 2019 y octubre de 2021. Además, esgrimió que al peticionario no le correspondían créditos a partir de febrero de 2023, por este haberse negado a arrendar la propiedad, en presunta violación de las órdenes del TPI.

Tras otros trámites procesales, el 15 de septiembre de 2025, ambas partes sometieron memorandos de derecho, con relación a los créditos que previamente estipularon, con lo cual quedó el asunto sometido para la consideración del foro primario.[17]

Luego de otros trámites procesales, el TPI dictó *Resolución* el 29 de octubre de 2025.[18] En primer lugar concluyó que "le asiste la razón a la demandada en cuanto al crédito por la mitad del pago de la hipoteca a partir de marzo de 2019 hasta octubre de 2021" y que "[c]orresponde como cuestión de derecho otorgar a la demandada un crédito por la mitad de los pagos realizados en concepto de pensión alimentaria por 32 meses".[19] El TPI fundamentó su decisión en lo que el Tribunal Supremo había resuelto en el caso de ***Díaz Rodríguez v. García Neris***, infra.

En segundo lugar, el TPI identificó que no había controversia en cuanto a los pagos realizados entre noviembre de 2021 y enero de 2023, por lo cual le correspondía al peticionario los créditos por esos pagos. Por último, el foro primario resolvió que el peticionario no era acreedor de los créditos por los pagos realizados a partir del 3 de febrero de 2023, toda vez que, a partir de esa fecha, el tribunal habría autorizado la renta de la propiedad y el peticionario no lo

---

[17] Íd., entradas núm. 412 y 413.
[18] Íd., entrada núm. 416.
[19] Íd.

permitió. Concluyó que dicha conducta era contraria a la doctrina de actos propios. Resolvió, *inter alia,* lo siguiente:

> Siendo la situación fáctica que tenemos en este caso, que el demandante se negó a dar cumplimiento con lo ordenado y además con ello impuso su criterio sobre el de la demandada quien es codueña de la propiedad, no podemos validar su conducta como una conducta de buena fe y mucho menos permitir que cree una situación para su propio beneficio. El demandante compareció a este Tribunal solicitando que la demandada pagar[a] la mitad de la hipoteca porque aleg[ó] que ella tenía bienes para pagar. La demandada compareció e indicó no tener la capacidad de pago. El Tribunal atendiendo la solicitud del propio demandante ordenó que la propiedad se pusiera en el mercado de rentas.[20]

Inconforme, el peticionario sometió ante el foro primario una *Moción de Reconsideración y en Solicitud de Determinaciones de Hechos y de Derecho Adicionales,* el 11 de noviembre de 2025.[21] Superados varios trámites procesales adicionales, el 9 de diciembre de 2025, la recurrida se opuso a la reconsideración del peticionario.[22] Tras trámites procesales adicionales, el foro primario emitió una *Resolución* el 10 de marzo de 2026, donde reiteró las conclusiones de su resolución inicial.[23]

Insatisfecho aun, el peticionario presentó el recurso de epígrafe en el que formuló los siguientes señalamientos de error:

**PRIMER ERROR:**
**Erró el Tribunal de Primera Instancia al aseverar que nuestro Tribunal Supremo ha establecido que el alimentista que tiene que pagar una hipoteca como parte de la pensión alimentaria de sus hijos menores de edad, crea con cada pago de la hipoteca en concepto de alimentos, un crédito de un 50% del pago en favor de la codeudora hipotecaria.**

**SEGUNDO ERROR:**
**Erró el Tribunal de Primera Instancia al no reconocerle al demandante codeudor hipotecario, un crédito por el 50% de los pagos que éste hiciera a la hipoteca en común, concluyendo que le había ordenado al demandante arrendar el inmueble hipotecado.**

---

[20] Íd., en las págs. 4-5.
[21] Íd., entrada núm. 421.
[22] Íd., entrada núm. 429.
[23] Íd., entrada núm. 435.

**TERCER ERROR:**
**Erró el Tribunal de Primera Instancia al prejuzgar de manera parcializada la controversia planteada ante su consideración, en lo referente a no conceder créditos al demandante desde la fecha que aduce el Tribunal le ordenó al demandante arrendar la propiedad hipotecada; por motivo que para llegar a dicha conclusión no aquilató prueba alguna, aun cuando había señalada una vista evidenciaría a dichos efectos y el demandante había presentado al Tribunal la prueba que estaría presentando en la vista evidenciaría en apoyo a sus argumentos.**

En síntesis, el peticionario arguyó que el foro primario, en primer lugar, malinterpretó lo resuelto por el Tribunal Supremo en ***Díaz Rodríguez v. García Neris***, infra. Además, el peticionario afirmó que el foro primario erró al concluir que previamente había ordenado el arrendamiento del inmueble, sin que hubiera una orden a esos fines. Por último, esgrimió que el TPI actuó de forma errada al emitir la orden sin haber celebrado la vista evidenciara pautada.

Por su parte, el 20 de abril de 2026, la recurrida presentó su oposición. Arguyó que el foro primario actuó correctamente al determinar que le correspondían los créditos, en virtud de lo resuelto en ***Díaz Rodríguez v. García Neris***, infra. Particularmente, alegó que "[n]o existe un solo pronunciamiento en Díaz que sugiera que la demandada en este caso no tiene derecho a crédito por el pago de pensión alimentaria, retenido por el demandante para el pago de la hipoteca".[24] Además, argumentó, entre otras cosas, que la doctrina de actos propios era aplicable a la conducta del peticionario. Esto porque el peticionario se había negado a arrendar la propiedad, lo que resultó en perjuicio de la recurrida. Con relación a lo anterior, la recurrida alegó que la doctrina de actos propios "obliga a que el demandante no puede ahora solicitar crédito porque este se auto infligió la obligación del pago al no permitir que el bien inmueble se rentara y tener una fuente de ingresos de un tercero para cubrir el

---

[24] *Véase* entrada núm. 4 en SUMAC-TA, pág. 18.

pago de la hipoteca en contra de la voluntad expresa de la recurrida".[25]

### III.

### A.

El recurso de *certiorari* es un recurso discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones interlocutorias de un foro inferior, sin que la parte que lo solicita tenga que necesariamente esperar a una sentencia final. ***IG Builders et al v. BBVAPR***, 185 DPR 307, 337 (2012). Véase también, ***Caribbean Orthopedics v. Medshape, Inc. et al.,*** 207 DPR 994, 1004 (2021). La determinación de expedir o denegar un recurso de *certiorari* está enmarcada dentro de la discreción judicial. Íd. La Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, dispone que solo se le confiere el poder de revisión a un tribunal de rango superior cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. Por vía de excepción, la regla expande la jurisdicción del Tribunal apelativo en materia de privilegios evidenciarios, admisibilidad de testigos, en casos que revistan un alto interés público y en casos de relaciones de familia, bajo la presunción de que de no permitir esta revisión interlocutoria ello conllevaría un fracaso irremediable a la justicia. Esta regla tiene como propósito evitar la revisión judicial de aquellas órdenes o resoluciones que dilatarían innecesariamente el proceso y cuales pueden esperar a ser planteadas a través del recurso de apelación. ***Scotiabank v. ZAF Corp. et. al.,*** 202 DPR 478, 486-487 (2019).

Por otro lado, el hecho de que el asunto sobre el cual se refiere el recurso de *certiorari* se encuentre comprendido en las instancias de la regla mencionada no significa que el examen que debe hacer

---

[25] Íd., pág. 26.

el tribunal revisor, previo a expedir un *certiorari,* se deba dar en el vacío o en ausencia de otros parámetros. ***800 Ponce de León Corp. v. AIG,*** 205 DPR 163, 176 (2020). En particular, nuestro Tribunal Supremo, mediante el Reglamento del Tribunal de Apelaciones, ha propuesto varios criterios adicionales a considerar para la expedición o denegatoria de este recurso. Estos son:

> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
> (E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
> (F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
> (G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.[26]

## B.

En Puerto Rico, los menores tienen un derecho fundamental a recibir alimentos, el cual emana de la cláusula constitucional del derecho a la vida consagrada en el Art. II, Sección 7 de nuestra Constitución. Art. II, Sec. 7, **Const. ELA**, LPRA, Tomo 1; ***Díaz Rodríguez v. García Neris,*** 208 DPR 706, 717 (2022); ***De León Ramos v. Navarro Acevedo,*** 195 DPR 157, 169 (2016); ***Fonseca Zayas v. Rodríguez Meléndez,*** 180 DPR 623, 632 (2011). Por esa razón, los casos de alimentos están revestidos del más alto interés público. ***Díaz Rodríguez v. García Neris,*** supra pág. 717. Estatutariamente, se reconoce el derecho a recibir alimentos como un derecho personalísimo, imprescriptible, continuo, indivisible y que no está sujeto a transacción, renuncia, gravamen, embargo o

---

[26] Regla 40 del Reglamento del Tribunal de Apelaciones, *In re* Aprob. Enmdas. Reglamento TA, 2025 TSPR 141, 215 DPR ____ (2025).

compensación. Art. 657 del Código Civil de Puerto Rico de 2020 (Código Civil), 31 LPRA sec. 7535. Nuestro Máximo Foro ha reiterado que "el derecho a alimentos corresponde **al menor**". *Díaz Rodríguez v. García Neris,* supra, pág. 724 (énfasis suplido).

Nuestro Código Civil consigna la obligación de los progenitores de alimentar a los hijos sujetos a su patria potestad. Véase el Art. 590 del Código Civil, *supra, sec.* 7242. Este es un deber que se ha reconocido como inherente a la paternidad. *De León Ramos v. Navarro Acevedo,* supra, pág. 169.

Cabe destacar varios de los preceptos principales que estatuye nuestro Código Civil sobre la pensión alimentaria. En primer lugar, se define como alimentos todo lo "[...] indispensable para el sustento, la vivienda, la vestimenta, la recreación y la asistencia médica de una persona, según la posición social de su familia". Art. 653 del Código Civil, *supra*, sec. 7531. Ahora bien, cuando el alimentista es menor de edad, los alimentos incluyen su educación, las atenciones de previsión según los usos y circunstancias de su entorno familiar y social, y los gastos extraordinarios para la atención de sus condiciones especiales. *Íd.*

### C.

Una vez se disuelve un matrimonio organizado bajo la sociedad legal de gananciales, nace entre los excónyuges "una comunidad de bienes y derechos sobre la totalidad de los elementos del patrimonio común que permanece en indivisión". Artículo 547 del Código Civil de Puerto Rico, *supra*, sec. 7041. En otras palabras, se crea una comunidad a base de los bienes que pertenecían a la sociedad de gananciales. *Rivera Lamberty v. Rodríguez Amador*, 205 DPR 194, 204 (2020). Cada excónyuge tiene un derecho sobre la totalidad de los bienes que compone la comunidad, y no sobre un bien en particular. *Betancourt González v. Pastrana Santiago*, 200 DPR 169, 179 (2018).

Esta comunidad opera como una comunidad de bienes, y, en ausencia de un acuerdo entre las partes, se rige por las normas aplicables; estas son: las normas particulares a la comunidad post ganancial, y las normas relativas a la comunidad de bienes, de manera supletoria. Artículo 554 del Código Civil, *supra,* 7048; ***Montalván v. Rodríguez***, 161 DPR 411, 421-422 (2004). En cuanto a los aspectos de la división y liquidación de la comunidad, aplican de manera supletoria los artículos del Código sobre la partición de la herencia. Artículo 554 del Código Civil, *supra.*

Nuestro Código Civil pauta que, como norma general, se presume que los integrantes de una comunidad post ganancial tienen participación igual sobre esta. Artículo 548 del Código Civil, *supra,* sec. 7042. No obstante, dicha presunción es rebatible. En particular, la presunción de igualdad de participación "es rebatible **respecto a toda obligación**, disminución en valor o deterioro causado por la actuación individual, dolosa o negligente, de uno de los cónyuges o excónyuges sobre el patrimonio común". Artículo 549 del Código Civil, *supra,* sec. 7043 (énfasis suplido). En cuanto a este artículo, los comentarios al Código Civil del 2020 añaden que "de existir prueba que demuestre que uno de los cónyuges o ex cónyuges ha invertido fondos propios, o que ha aportado esfuerzo exclusivo o desigual para su desarrollo o conservación, puede aspirar a una participación mayor en todos los elementos del patrimonio indiviso que excedan el valor del inventario original".[27]

El artículo 550 del Código Civil establece que un "excónyuge comunero no está obligado a desarrollar el patrimonio común para que produzca frutos o **productos adicionales a los que natural o necesariamente pudiera generar**". *Véase* sec. 7044 (énfasis

---

[27] Oficina de Servicios Legislativos, *Código Civil de Puerto Rico (Comentado)*. El Código Civil Comentado recoge todos los comentarios que generó la Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto. Lo citamos aquí como fuente persuasiva.

suplido). Ahora, si este excónyuge comunero opta por desarrollar el patrimonio común sin el consentimiento del resto de la comunidad, o en exclusión de estos, entonces adviene responsable por cualquier menoscabo que pudieran sufrir como consecuencia de sus actos. Íd. Conviene sumar, a estos articulados, la norma proveniente de la regulación de la comunidad de bienes, a los fines de que todo comunero "está obligado a contribuir al pago de los **gastos necesarios para la conservación** de la cosa o derecho común...". Artículo 843 del Código Civil, *supra*, sec. 8205 (énfasis suplido). Nuestro más Alto Foro ha determinado que el "pago de la hipoteca es una de las cargas que corresponde distribuir entre los partícipes de la comunidad, de acuerdo con sus respectivas cuotas". ***Díaz v. Aguayo***, 162 DPR 801, 816 (2004).[28]

A su vez, conviene recordar que, si bien es cierto que todos los comuneros advienen responsables por el bien en común, quien de estos utilice el bien de forma exclusiva, viene obligado a resarcir a los restantes comuneros por dicho uso ilegal. Artículo 840 del Código Civil, *supra*, sec. 8202. Nuestro ordenamiento jurídico prohíbe "el monopolio del uso de la cosa común". ***Díaz v. Aguayo***, supra, págs. 811-812. Nuestro Tribunal Supremo recientemente aclaró que el mero uso del bien de parte de un comunero no implica necesariamente que se esté usando de forma exclusiva. ***Rivera Lamberty v. Rodríguez Amador***, supra, págs. 211-212. Conforme a la tradición civilista, nuestro Tribunal Supremo concluyó que "el mero uso de la cosa común por uno solo de los comuneros no

---

[28] El Tribunal Supremo interpretó el artículo 327 del Código Civil del 1930, cuya norma se encuentra ahora en los artículos 837 y 838. El artículo 327 leía: "El concurso de los partícipes, tanto en los beneficios como en las cargas, será proporcionado a sus respectivas cuotas. Se presumirán iguales, mientras no se pruebe lo contrario, las porciones correspondientes a los partícipes en la comunidad". El texto de estos dos artículos al presente lee: "Las cuotas de los comuneros se presumen iguales. Los derechos y las obligaciones de los comuneros son proporcionales a sus respectivas cuotas en la comunidad".

supone un uso ilícito que requiera un resarcimiento por privación de uso a los demás copropietarios". Íd. (énfasis omitido).

**D.**

La doctrina de actos propios es una norma que emana del concepto amplio de equidad contemplado en los Artículos 2, 5 y 6 del Código Civil, *supra*, sec. 5312, 5315, 5316. En particular, esta doctrina procura disuadir el que las personas actúen en contra de sus propios actos y propiciar que obren de buena fe en el ejercicio de sus derechos y en el cumplimiento de las obligaciones en las que incurran en variadas relaciones jurídicas. *Int. General Electric v. Concrete Builders,* 104 DPR 871, 876-77 (1976); *Vivoni Farage v. Ortiz Carro,* 179 DPR 990, 1010 (2010).

Para que sea de aplicación la doctrina de los actos propios, deben reunirse los siguientes elementos:

> (a) una conducta determinada de un sujeto; (b) **que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás**; y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su confianza quedara defraudada. *Int. General Electric v. Concrete Builders*, *supra*, en la pág. 878. Ver también *Vivoni Farage v. Ortiz Carro*, *supra*, en las págs. 1010–11.

Es decir, en virtud de esta doctrina, un litigante está impedido de adoptar una actitud contradictoria a una conducta anterior sobre la cual la parte perjudicada ha confiado, sin importar la verdadera intención de la parte que genera esa confianza. *Pardo v. Sucn. Stella*, 145 DPR 816, 829 (1998).

**IV.**

Mediante el recurso de epígrafe, el peticionario impugna la *Resolución* que, *inter alia*, le concedió un crédito a la recurrida por los pagos de la hipoteca entre marzo de 2019 a octubre de 2021 y, por otro lado, le denegó un crédito al peticionario por los pagos de la hipoteca realizados posterior al 3 de febrero de 2023. En

resumidas cuentas, adujo que el foro primario había malinterpretado el caso resuelto por el Tribunal Supremo de *Díaz Rodríguez v. García Neris*, supra; que se equivocó al concluir que el peticionario no era acreedor de un crédito por haberse negado a rentar la propiedad y, como último argumento, que el TPI actuó de manera parcializada. Tras un análisis objetivo, sereno y cuidadoso del expediente del caso, razonamos que procede expedir el recurso de *certiorari* y modificar la *Resolución* recurrida. Nos limitaremos a la consideración de las alegaciones pertinentes a la controversia ante nos. Veamos.

En su primer señalamiento de error, el peticionario sostiene que el foro primario incidió al concederle a la recurrida un crédito por la mitad de los pagos a la hipoteca. Esto, al fundamentar su determinación en un caso del Tribunal Supremo que, según el peticionario, no apoya dicha conclusión. Le asiste la razón.

El referido señalamiento de error requiere que analicemos, en primer lugar, el caso de *Díaz Rodríguez v. García Neris*, supra, para luego evaluar si el TPI lo aplicó correctamente. Los hechos que se enfrentó el Tribunal Supremo fueron los siguientes: las partes habían acordado que el pago de la pensión alimentaria iría en su totalidad para el pago de la hipoteca, y que el padre custodio (en este caso, la madre) costearía el resto de las necesidades de las hijas menores de edad. Específicamente, habían estipulado que la cuantía que correspondía en concepto de pensión alimentaria sería de $453.00 mensuales, pero que el señor Díaz Rodríguez pagaría $553.00 mensuales, lo cual era el pago mensual de la hipoteca. *Díaz Rodríguez v. García Neris*, supra, pág. 711. Además, las partes estipularon que, una vez las menores adquiriesen la mayoría de edad, estos venderían la propiedad y que, a partir de dicha venta, las partes podrían reclamar cualquier crédito que les

correspondiera, luego de descontar las aportaciones a la pensión alimentaria. Íd.

La controversia surgió al momento de liquidar la comunidad post ganancial. El señor Díaz Rodríguez alegaba que le correspondía un crédito por lo que pagó en exceso de la pensión alimentaria, dígase, los cien dólares de diferencia entre el pago de la hipoteca ($553.00) y de la pensión ($453.00). Por su lado, la señora García Neris alegaba que le correspondía un crédito por los pagos de la hipoteca que realizó el señor Díaz Rodríguez, dado a que esta entendía que esos pagos debían ser considerados haber sido realizados por ella. Íd., en la págs. 712-713. Ella argumentaba que "que como persona custodia, y en su facultad de administradora, [ella fue quien] escogió que la totalidad de la pensión fuera dirigida al pago de la residencia". Íd. El Tribunal de Primera Instancia le dio la razón y, luego de aplicar las *Guías Mandatorias para Computar las Pensiones Alimentarias*, dividió el pago de la hipoteca entre los tres habitantes de la residencia. A partir de ese cálculo, el foro primario concedió un crédito de $151 por mes a la señora García Neris, para un total de $24,462.00. Íd., en la págs. 714-715.

A pesar de haber recibido un crédito a su favor, la señora García Neris recurrió dicha determinación ante el foro apelativo, donde arguyó que el TPI le concedió un crédito indebido a la otra parte. El foro intermedio denegó el recurso, por lo cual la señora García Neris recurrió al Tribunal Supremo. El caso fue presentado con un solo señalamiento de error: que el foro primario había errado en aplicar las guías, lo que resultó en un crédito en exceso a favor del señor Díaz Rodríguez.

El Tribunal Supremo inició su opinión con la exposición del derecho aplicable a la controversia ante su consideración. Luego de reseñar las normas doctrinales, nuestro Máximo Foro afirmó que "**el derecho a alimentos corresponde al menor** y lo hace acreedor de

aquellos alimentos que satisfagan lo indispensable para su sustento...". Íd., en la pág. 724 (énfasis suplido). Añade a esto que "no cabe duda de que los $453, que proveía el recurrido mediante la pensión alimentaria, **pertenecían a sus hijas menores de edad** y que contribuían en cierta proporción a las distintas necesidades de estas". Íd., en la pág. 725 (énfasis suplido). El hecho de que los pagos de la pensión se hicieran en la forma del pago de la hipoteca, no cambiaba su naturaleza. Íd. Continuó el Tribunal Supremo de la siguiente forma: "teniendo presente que la pensión alimentaria pertenece exclusivamente a las menores, concluimos que el texto del acuerdo es claro al requerir descontar las aportaciones a la pensión alimentaria previo a que el excónyuge reclame lo que le corresponde de la ganancia obtenida". Íd.

Es decir, de los $553 que pagaba el señor Díaz Rodríguez de hipoteca, debían de descontarse $453 que pagaba en concepto de pensión, por los cuales no podía exigir un crédito. De esa cantidad remanente ($100.00), el Tribunal Supremo concluyó que le correspondía al señor Díaz Rodríguez un crédito equivalente a la mitad. Íd., en la pág. 726. Nuestro más alto foro le dio importancia al hecho de que las partes habían estipulado que, al vender el inmueble, las partes podrían reclamar cualquier crédito que pudieran tener, luego de descontados los pagos por pensión alimentaria.

Finalmente, en cuanto a los créditos de la señora García Neris, el Tribunal Supremo concluyó que el acuerdo no recogía nada sobre ello. En virtud de eso, el Máximo Foro determinó que resultó ser irrazonable que el foro primario usara las Guías Mandatorias para calcular cualquier posible crédito que pudiera tener. Íd., en la pág. 726. Concluyeron la opinión con la siguiente determinación: "la peticionaria puede reclamar lo que le corresponde. **En vista de que no existe en el expediente información sobre gastos de**

**conservación, mantenimiento u otros posibles créditos que ella pueda adicionalmente reclamar**, su participación se limita al exceso **no correspondiente al recurrido**". Íd., en la pág. 727 (énfasis suplido). El Tribunal Supremo se rehusó a concluir que le correspondía, como cuestión de derecho, la mitad de los pagos que hubo realizado el señor Díaz Rodríguez en concepto de hipoteca. La conclusión judicial resuelve que esta tendría derecho a lo que pudiera probar, si algo, en su día.

De la opinión del Tribunal Supremo de Puerto Rico, no se aprecia una determinación expresa de que, al realizar pagos de hipoteca en concepto de pensión alimentaria, se crea un crédito a favor de la codeudora hipotecaria. El caso de ***Díaz Rodríguez v. García Neris***, supra, establece con claridad que cuando un pago de hipoteca se realiza, a su vez, para satisfacer una obligación alimentaria, el alimentante no puede luego descontar ese pago como un crédito. Esto último no está en controversia en el caso ante nos, dado a que el peticionario no reclamó créditos por los pagos realizados en concepto de hipoteca mientras los hijos vivían exclusivamente con la recurrida. Por el contrario, quien peticionó un crédito por los pagos de la hipoteca realizados entre el marzo de 2019 a octubre de 2021 fue la recurrida.[29]

No tiene razón el foro primario cuando concluye que "[l]a recipiente de la pensión alimentaria lo era la demandada",[30] toda vez que la ley—y la opinión citada precedentemente del Tribunal Supremo—es clara en que los acreedores de los pagos en concepto de pensión alimentaria <u>siempre son los menores</u>. Lo resuelto en ***Díaz Rodríguez v. García Neris***, supra, no altera esta conclusión. Tampoco hay lenguaje en la opinión destacada que apoye la noción de que la recurrida es acreedora de la mitad de los pagos de la

---

[29] *Véase* entrada núm. 408, pág. 3, del SUMAC-TPI.
[30] Ver entrada núm. 416, a la pág. 2, en SUMAC-TPI.

hipoteca que realizó el peticionario en concepto de pensión alimentaria. En virtud de lo anterior, colegimos se cometió el error señalado.

En su segundo señalamiento de error, el peticionario arguye que erró el foro primario al negarle un crédito por los pagos de la hipoteca realizados posterior al 3 de febrero de 2023. Esto, al concluir que se le había ordenado a arrendar el inmueble hipotecado, y que, al negarse a cumplir con esta orden, había creado una situación jurídica favorable para él y desfavorable para la recurrida. El foro primario concluyó señalando que las actuaciones del peticionario fueron contrarias a la doctrina de actos propios. Tras un examen minucioso del expediente, concluimos que le asiste la razón al peticionario.

El foro primario razonó que, dado al incumplimiento del peticionario a las órdenes previamente emitidas, este no podía reclamar crédito alguno por los pagos de la hipoteca que realizó. No obstante, un examen sosegado de las resoluciones pertinentes revela un cuadro distinto.

En primer lugar, el TPI emitió la *Resolución* del 23 de noviembre 2022, donde resolvió, en parte, que "[c]ualquier pago realizado por el demandante sobre la referida hipoteca **podrá ser reclamado como crédito al momento de la liquidación final de la Sociedad Legal de Gananciales**".[31] Esta resolución fue emitida en respuesta a una solicitud del peticionario, a los fines de que el TPI le impusiera a la recurrida el pago de la mitad de la hipoteca. El foro primario le negó dicha petición, y optó por asegurarle al peticionario que tendría derecho <u>luego</u> a recobrar un crédito por los pagos realizados. El peticionario solicitó una reconsideración, a lo cual el foro primario contestó "se declara No Ha Lugar la solicitud

---

[31] *Véase* entrada núm. 186 en SUMAC-TPI. Énfasis suplido.

... **y se mantiene vigente la Resolución del 23 de noviembre de 2022 en relación al pago de la hipoteca**. Se autoriza que la propiedad se alquile para el beneficio del pago de la hipoteca ...".[32]

Vemos que el dictamen del TPI estableció expresamente que la *Resolución* inicial, la cual pautaba que el peticionario tendría derecho a un crédito al liquidarse la comunidad, permanecía vigente. En otras palabras, la nueva resolución no alteró la resolución previamente emitida, en cuanto a los pagos de la hipoteca. Por ende, el peticionario debía de continuar pagando la totalidad de la hipoteca, en conformidad con la resolución del 23 de noviembre de 2022. Por ello, no son correctos los pronunciamientos de la parte recurrida en cuanto a que la resolución del 3 de febrero de 2023 en alguna forma enmendaba o alteraba la resolución previa.[33]

La *Resolución* del 3 de febrero de 2023, luego de denegar la reconsideración del peticionario, añade que se **autoriza** la renta de la propiedad, como una medida para asistir con el pago de la hipoteca. Nada en el lenguaje de la *Resolución* genera la impresión de que se emitió una orden <u>expresa</u> al peticionario que debe de arrendar el bien, so pena de perder cualquier crédito que pudiera tener por emitir los pagos. Las únicas expresiones en dicha resolución con relación al pago de la hipoteca son las siguientes: "se mantiene vigente la Resolución del 23 de noviembre de 2022". Por ello, lo único que surge de la mencionada *Resolución* es que no se obligaría a la recurrida a pagar la mitad de la hipoteca, y que el peticionario tendría derecho a un crédito al liquidarse la comunidad de bienes.

---

[32] *Véase* entrada núm. 209 en SUMAC-TPI. Énfasis suplido.
[33] *Véase* entrada núm. 4 en SUMAC-TA, pág. 4, párr. 16. Ver también, del mismo escrito, pág. 22.

Contrario a lo que sugiere la recurrida, dicha conclusión no se ve alterada por unas expresiones del foro primario realizadas durante una vista de seguimiento celebrada el 1 de julio de 2024 y recogidas en una *Minuta*, a los fines de reiterar que "el alquiler fue autorizado previamente".[34] Dicha *Minuta* recoge lo discutido como parte de una *Vista sobre el estado de los procedimientos*. En cuanto a la situación del arrendamiento de la propiedad, la minuta solo resume que se hayan discutido dos asuntos: en primer lugar, que la recurrida estaba preocupada por los gastos de la hipoteca, ya que no se había alquilado la propiedad, y, en segundo lugar, las expresiones del foro primario a los fines de que ya se había autorizado la renta del inmueble. La parte dispositiva de la *Minuta* no hace referencia a este asunto.[35]

Nuevamente destacamos que no se desprende que el TPI hubiera ordenado expresamente al peticionario a alquilar la propiedad. Nada en la *Minuta* sugiere que el foro primario hubiere dado seguimiento al peticionario por alegadamente incumplir con su orden de alquilar la casa. Tampoco podemos observar que se le hubiera impuesto una fecha para entrar en cumplimiento. En ausencia de lo antes mencionado, no podemos concluir que operase en este caso una orden afirmativa a los fines de que el peticionario pusiera la propiedad a la renta. Más aún, se señaló una vista evidenciaria para resolver dicho asunto, pero nunca se llevó a cabo. No obstante, dicha celebración era indispensable para la adjudicación del pleito, y el foro primario debió haberla realizado.

A falta de una orden expresa, debemos de consultar si el Código Civil le impone una obligación contraria. Según reseñamos anteriormente, el artículo 550 del Código Civil, *supra*, prescribe que

---

[34] *Véase* entrada núm. 319 en SUMAC-TPI.
[35] Íd., en la pág. 1. Lee la *Minuta* "A esta postura, el Tribunal destaca que el alquiler fue autorizado previamente".

un excónyuge comunero no tiene la obligación de "desarrollar el patrimonio común para que produzca frutos o productos adicionales a los que natural o necesariamente pudiera generar". Por ello, en ausencia de una orden del TPI, el peticionario no estaba en la obligación de poner la propiedad en renta.

Por otro lado, colegimos que resultan inaplicables las normas que provienen de la doctrina de los actos propios. Recordemos que la doctrina exige que concurran: (1) una conducta de un sujeto, (2) una situación contraria a la realidad creada por la antes mencionada conducta y (3) que un tercero haya sufrido un perjuicio a consecuencia de haber depositado su confianza en la representación de la otra parte. ***Carmona, Negrón v. BSN y otros***, 214 DPR 388, 399 (2024).

No estamos ante un escenario como el que visualiza la jurisprudencia para la aplicación de dicha doctrina, en donde el peticionario, mediante sus actuaciones, haya engendrado una situación contraria a la realidad, y que, mediante esas presentaciones, haya inducido a error a la recurrida. Por el contrario, lo que generó la situación fue una resolución del foro primario que eximió a la recurrida de tener que pagar la mitad de la hipoteca—obligación que a esta le correspondía—y, a su vez, garantizándole un crédito al peticionario, cuando se haya liquidado la comunidad. Obra en este caso, también, una resolución adicional donde el TPI reitera sus instrucciones iniciales sobre el particular.

No coincidimos con la conclusión del foro primario en cuanto a que la conducta del peticionario haya creado una situación que le beneficiare. El peticionario cumplió con el pago de la totalidad de la hipoteca bajo la expectativa de que recibiría un crédito a cambio, según le aseguró el TPI. El cumplimiento continuo con la obligación de pagarle al acreedor hipotecario beneficia a ambas partes, dado que constituye un pago necesario para conservar el bien. Tampoco

concordamos con la conclusión de que la negativa de arrendar la propiedad haya sido lo que creara una situación perjudicial para la recurrida.

Reiteramos, fue la resolución del foro primario la que estableció las condiciones imperantes. Dado a que *Resolución* emitida el 3 de febrero de 2023 no alteró la *Resolución* emitida del 23 de noviembre de 2022, resulta forzoso concluir que la actuación del peticionario no lo priva de los créditos que se le habían reconocido previamente. Por todo lo anterior, concluimos que se cometieron los errores señalados.

## V.

Por los fundamentos antes expuestos, se expide el auto de *certiorari* y se *revoca* la *Resolución* recurrida. Consecuentemente se elimina la partida concedida a la recurrida en concepto de créditos, por los pagos de la hipoteca realizados entre el marzo de 2019 y octubre de 2021. Además, se revoca la determinación del TPI que establece que el peticionario no tiene derecho a un crédito por los pagos hipotecarios realizados posterior al 3 de febrero de 2026. A su vez, se confirma la determinación del foro primario en cuanto a los créditos otorgados entre noviembre de 2021 y febrero de 2023.

Se devuelve el caso al TPI para que se celebre una vista en donde se desfile prueba con relación a los créditos que pudiera tener el peticionario a partir del 3 de febrero de 2023.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones